765 F.2d 144
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
BARCLAYSAMERICAN/BUSINESS CREDIT, INC. PLAINTIFF-APPELLEE,
v.
COMMERCE UNION BANK, TRUSTEE, DEFENDANT-APPELLANT.
 NO. 84-5501
 United States Court of Appeals, Sixth Circuit.
 5/29/85
 
 On Appeal from the United States District Court for the Eastern District of Tennessee
 Before: Engel and Keith, Circuit Judges, and Phillips, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is an appeal by the defendant, Commerce Union Bank, from a memorandum opinion entered on May 3, 1984, by the United States District Court for the Eastern District of Tennessee, Magistrate Robert P. Murrian, presiding. This case arises under Article 9 of the Uniform Commercial Code, codified in Tennessee as Tennessee Code Annotated Section 47-9-101 et seq. Heywood-Wakefield, Inc. is the common debtor of both Commerce Union Bank, a banking corporation organized under Tennessee law with its principal place of business in Nashville, Tennessee, and BarclaysAmerican/Business Credit, Inc., a Connecticut corporation with its principal place of business in Hartford, Connecticut. Both parties claim a security interest in collateral consisting of machinery and equipment formerly owned byHeywood-Wakefield and located in its Newport, Tennessee plant. Pursuant to an agreement between the parties, the collateral was sold and the sum of $180,000 was placed in escrow pending the resolution of this dispute. The parties likewise agreed that the judgment, if any, would be limited to the sum on deposit plus interest. The magistrate entered judgment in favor of BarclaysAmerican for the $180,000 plus any earnings thereon while the sum was in escrow. Commerce Union filed a timely notice of appeal. For the reasons set forth below, the judgment of the district court is affirmed.
 
 
 2
 For many years Heywood-Wakefield manufactured and sold household furniture, school furniture, theatre seating and auditorium seating. Prior to 1973, these products were produced in plants located in Gardner, Massachusetts, Menominee, Michigan, and Newport, Tennessee. Heywood-Wakefield used a patented process known as the 'HeyWoodite' process to produce a tough, durable and fire-resistant plastic material for desk tops, tables, and chair seats and backs. Prior to 1973 it had produced HeyWoodite only at its Gardner, Massachusetts plant.
 
 
 3
 In 1972 Heywood-Wakefield decided to build a 60,000 square foot building adjacent to the existing Newport site on five of the 45 acres that Heywood-Wakefield owned. This free-standing facility became known as the HeyWoodite building. In order to finance construction of the HeyWoodite building and in order to equip the building for production of HeyWoodite, industrial revenue bonds in the principal amount of $2,750,000 were issued by the Industrial Development Board of Cooke County, Tennessee (IDB). Commerce Union was appointed trustee under the bond indenture.
 
 
 4
 The proceeds of the sale of the bonds were deposited into a construction acquisition account at Commerce Union. Funds were disbursed throughout a two year period during construction. Due to increases in costs and changes in the facility, the bond proceeds were not adequate to fund the cost of construction and the cost of the equipment. Heywood-Wakefield was forced to spend approximately $1,500,000 of its own funds in completing the facility. The facility became operational and production continued until the facility was closed after Heywood-Wakefield's bankruptcy.
 
 
 5
 In order to secure the repayment of the bonds, Heywood-Wakefield deeded the five-acre tract to the IDB and executed a bill of sale on certain machinery and equipment which was to be purchased with the bond proceeds and placed in the HeyWoodite building. Effective June 1, 1973, Heywood-Wakefield entered into a lease agreement with the IDB. The lease agreement provided that the IDB would lease the five-acre tract, the HeyWoodite building, and certain 'leased equipment' to Heywood-Wakefield for 20 years. Upon conclusion of the lease or payment of the balance due on the bonds, Heywood-Wakefield would purchase the real estate, improvements and personal property for the sum of $100. The lease agreement, in relevant part, defined 'leased equipment' as follows:
 
 
 6
 'Leased equipment' means those items of machinery, equipment and related property required or permitted herein to be acquired and installed in the [HeyWoodite] Building . . . with proceeds from the sale of the bonds . . . (which property is described generally in Exhibit A hereto and will be described in the instruments referred to in Section 12.8 hereof) . . . but not including the lessee's own machinery and equipment installed under the provisions of Sections 6.1 and 9.7 hereof. All of lessee's own machinery and equipment installed under Section 6.1 and 9.7 shall be and remain identified as such by tags or other symbols affixed thereto. All property not so identified shall be presumed to be leased equipment.
 
 
 7
 Jt. App. at 200 (Ex. 7, p.3) (emphasis added).
 
 
 8
 On November 14, 1973, IDB filed a financing statement with the Secretary of State of the State of Tennessee which covered the following types or items of property:
 
 
 9
 All machinery, equipment and other personal property leased or to be leased under that certain Lease Agreement dated as of June 1, 1973, between the Secured Party [IDB], as Lessor, and the Debtor [Heywood-Wakefield], as Lessee, including without limitation the equipment and other personal property described in Exhibit A hereto and made a part hereof and all accessions thereto, substitutions therefore and replacements thereof.
 
 
 10
 Jt. App. at 258.
 
 
 11
 The IDB entered into a mortgage and indenture of trust with Commerce Union as trustee. The IDB assigned all of its right, title and interest to Commerce Union in connection with the five-acre tract, the lease between the IDB and Heywood-Wakefield, and
 
 
 12
 The machinery, equipment and other tangible personal property owned by the Board and described in Exhibit B hereto (which machinery, equipment and property is to be located on the real estate described in Exhibit A hereto), excluding property installed by the lessee pursuant to Section 6.1 and 9.7 of the lease, together with all other machinery, equipment and further tangible personal property which is now owned or hereafter acquired by the Board and which is now or at any time hereafter located on the real estate described in Exhibit A hereto, excluding property installed by the lessee pursuant to Sections 6.1 and 9.17 of the lease, subject, however, to permitted encumbrances.
 
 
 13
 Jt. App. at 233 (Exhibit 8, p.16). Further, the mortgage indenture trust defined leased equipment as follows:
 
 
 14
 'Leased Equipment' means those items of machinery, equipment and related property required or permitted in the lease to be acquired and installed in the [HeyWoodite] building . . . All of lessee's [Heywood-Wakefield's] own machinery and equipment installed under Sections 6.1 and 9.7 of the Lease shall be and remain identified as such by tage or other symbols affixed thereto. All property not so identified shall be presumed to be Leased Equipment and subject to the security interest created by, or the lien of, this mortgage.
 
 
 15
 Jt. App. at 236 (Exhibit 8, p.19).
 
 
 16
 The collateral in question was owned by Heywood-Wakefield and was used in the plant in Gardner, Massachusetts. The equipment was transported to Newport where it was installed in the new HeyWoodite facility. Although the disputed collateral was not listed in the bill of sale, it was never tagged or otherwise identified as the separate property of Heywood-Wakefield until two months after this lawsuit was filed. The disputed collateral was incorporated into the facility and it became essential to its operation. Although the disputed collateral was not purchased with bond proceeds, the cost of its transportation to Newport, the cost of installation and the cost of refurbishing were paid for out of bond proceeds.
 
 
 17
 In 1973, George H. Heywood, Jr., former chairman of the board of directors of Heywood-Wakefield, apparently determined that the disputed property would be part of the collateral securing the payment of the principal and interest on the industrial revenue bonds. In February 1973, Heywood had discussions with representatives of Cumberland Securities Company on how to best structure the transaction to assure the marketability of the bonds. It was agreed that in addition to the plant and equipment to be purchased with the bond proceeds additional equipment having a book value of approximately $235,000 would also be pledged as security for the bonds. As documents were being drafted this additional equipment was described as being equipment to be transferred from Gardner, Massachusetts to the new facility. In letters dated June 27, 1973, addressed to three Heywood-Wakefield creditors, Heywood wrote:
 
 
 18
 The plant will be constructed by the Board [IDB] on land presently owned by the Company which will be transferred to the Board for a nominal consideration. The Plant will also include machinery and equipment with a book value of $235,000 to be transferred from the Company's Gardner, Massachusetts plant to the Plant. The Plant will be leased to the Company by the Board pursuant to a lease dated as of June 1, 1983 (the 'Lease') for a term expiring on May 31, 1983, and providing for rental payments sufficient to pay interest due on the Bonds from time to time as well as the principal amount thereof and sinking fund instalments [sic] and certain related expenses. The Plant and the Lease thereof will be mortgaged to the Trustee under the Indenture providing for the issuance of the Bonds as security for the payment of the Bonds.
 
 
 19
 Jt. App. at 321 (Ex. 25) (emphasis added).
 
 
 20
 The IDB's 'Official Statement' dated November 15, 1973, states that:
 
 
 21
 The existing plant and warehouse are owned by the [Heywood-Wakefield] Company; however, only the new building, the approximately five-acre site on which it will be located and the machinery and equipment to be installed therein will be pledged as security for the Bonds under the Indenture.
 
 
 22
 .............................................................
 
 
 23
 ...................
 
 
 24
 * * *
 
 
 25
 The [Heywood-Wakefield] Company plans to transfer additional machinery and equipment having an approximate book value of $235,000 from its Gardner, Massachusetts plant to the Project. Such additional machinery and equipment will be part of the Project and pledged under the Indenture.
 
 
 26
 Jt. App. at 244 (Ex. 9, p.2) (emphasis added). Notwithstanding these various expressions of the debtor intent, however, it must be noted that no representative of Heywood-Wakefield signed this 'Official Statement' and this apparent intention of the parties to include the transferred equipment as part of the collateral for the IDB Bond issue was never reduced to a writing signed by both parties.
 
 
 27
 The lease agreement did allow Heywood-Wakefield to place machinery and equipment at its own expense into the HeyWoodite building without subjecting that machinery and equipment to the lien to secure the bond proceeds. However, the ability to install separate equipment which was not to be subject to the IDB's lien was not unlimited.Heywood-Wakefield was required to install the equipment at its own expense and to tag or otherwise suitably identify the equipment as being Heywood-Wakefield's separate property. As noted in Section 9.7 of the lease:
 
 
 28
 Section 9.7. Installation of Lessee's Own Machinery and Equipment; Landlord's Lien Thereon . . . [T]he Lessee may from time to time, in its sole discretion and at its own expense, install additional machinery and equipment in the Building or on the Leased Land. All machinery and equipment so installed by the Lessee shall remain the sole property of the Lessee in which neither the Board nor the Trustee shall have any interest, may be modified or removed at any time while the Lessee is not in default hereunder and shall not be subject to the lien of the Indenture but all such machinery and equipment . . . shall be subject to any landlord's lien allowed by law. The Lessee shall tag or otherwise suitably identify without expense to the Lessor, all tangible personal property constituting the sole property of the Lessee and not constituting a part of the Leased Equipment, so as to indicate the lack of any interest of the Board and the Trustee therein . . . Lessee agrees to pay as due the purchase price of and all cost and expenses with respect to the acquisition and installation of any machinery and equipment installed by it pursuant to this section.
 
 
 29
 Jt. App. at 216 (Ex. 7, p.34) (emphasis added).
 
 
 30
 On January 21, 1982, BarclaysAmerican loaned Heywood-Wakefield $3,600,000. Heywood-Wakefield executed a form security agreement purporting to grant BarclaysAmerican a security interest in all of Heywood-Wakefield's machinery, equipment and fixtures. See Jt. App. at 172 (Ex. 1.) Financing statements were filed with the Secretary of State of the State of Tennessee and with the Register of Deeds of Cooke County, Tennessee, on January 14, 1982.
 
 
 31
 In its preliminary negotiations with Heywood-Wakefield, BarclaysAmerican had assumed that '[t]he land, real estate improvements and machinery and equipment, comprising the 55,000 square foot 'Heywoodite' facility would be excluded from [their] security.' Jt. App. at 271 (Ex. 11, p.2). However, when the loan was closed, Heywood-Wakefield executed a form security agreement which described the collateral as [a]ll goods of Debtor, including without limitation, machinery [and] equipment . . . of every kind and description and all improvements thereto which the Debtor now owns or in which Debtor may have or may hereafter acquire any interest. . . .' Jt. App. at 172 (Ex.1). (emphasis added).
 
 
 32
 Approximately two months later Heywood-Wakefield filed for reorganization under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. Subsequently, on July 5, 1983, the bankruptcy court granted BarclaysAmerican permission 'to foreclose upon all collateral subject to its security interest and/or lien, including, without limitation, the Newport real property and equipment.'
 
 
 33
 In the action below, the magistrate found that Commerce Union Bank's security interest extended only to leased equipment, that the disputed collateral was not 'leased equipment' within the meaning of the IDB-Heywood-Wakefield 'Lease' and that therefore Commerce Union Bank, as assignee, did not have a security interest in the disputed collateral. BarclaysAmerican/Business Credit, Inc., v. Commerce Union Bank, No. CIV-3-83-707 (E.D. Tenn. 1984) [hereinafter Memo. Op.].
 
 
 34
 On appeal, Commerce Union Bank raises two arguments for reversal. First Commerce Union contends that the magistrate erred in holding that it did not have a security interest in the disputed collateral. Second, Commerce Union contends that the magistrate erred in holding that BarclaysAmerican did have a security interest in the disputed collateral. We find both of these arguments to be without merit.
 
 
 35
 With respect to Commerce Union's first argument, we agree with the magistrate that the appellant did not have a perfected security interest in the disputed collateral. The basic document upon which the appellant must rely to establish its security interest is the lease agreement executed between IDB and Heywood-Wakefield and subsequently assigned in the Mortgage and Indenture of Trust. The crucial provision of the lease agreement relating to the property to be secured is found in the definitional section of the lease agreement which provides as follows:
 
 
 36
 'Leased Equipment' means those items of machinery, equipment, and related property required or permitted herein to be acquired and installed in the [HeyWoodite] building . . . (which property is described generally in Exhibit 'A' hereto and will be described in the instruments referred to in Section 12.8 hereof) . . . but not including the lessee's own machinery and equipment installed under the provisions of Section 6.1 and 97 hereof. All of Lessee's own machinery installed under Section 6.1 and 9.7 shall be and remain identified by such tags or other symbols affixed thereto. All property not so identified shall be presumed to be leased equipment.
 
 
 37
 Jt. App. at 200 (Exhibit 7) (emphais added). The trial court found that the defendant's security interest was limited by the language of its agreement to 'leased equipment,' that the equipment and machinery transferred from Massachusetts to Tennessee was not described in Exhibit 'A' to the lease agreement and that there was no evidence Exhibit 'A' was expanded pursuant to the terms of section 12.8 of the lease agreement or otherwise. Memo. Op. at 15, 23-26. The trial court also found that the machinery and equipment transferred from Massachusetts to Tennessee was not acquired with bond proceeds, that the title of said property was never transferred from Heywood-Wakefield to IDB and leased back so as to become part of the 'leased equipment' and that the equipment and machinery transferred from Massachusetts was not substituted for, nor did it replace the equipment listed in Exhibit 'A' to the agreement. Memo. Op. at 15-16. The appellant has not seriously disputed these findings of fact. Since the property transferred from Massachusetts was not acquired and installed with bond proceeds and was not described in Exhibit 'A' to the lease agreement, appellant has not shown that it had an agreement signed by the debtor reasonably describing the collateral.
 
 
 38
 Further, as with security agreements, a financing statement must contain 'a statement indicating the types or describing the items of collateral.' See Tenn. Code Ann. Sec. 47-9-402(1). This section is designed to comply with the language of U.C.C. Section 9-110 requiring reasonable identification of collateral. Tenn. Code Ann. Sec. 47-9-402 comment 1. The description of collateral contained in defendant's financing statement is expressly limited to property 'leased or to be leased under that certain Lease Agreement of June 1, 1973, . . . and all accessions thereto, substitutions therefor and replacements thereof.' Jt. App. at 258 (Exhibit 10). The direct testimony of George Heywood indicated that the property transferred from Massachusetts was not a substitution, nor replacement for any of the leased property. Jt. App. at 90; Memo. Op. at 16. Although the machinery and equipment of Heywood-Wakefield was installed in the Tennessee plant, this separate property of Heywood-Wakefield was never 'installed in or affixed to other goods [leased equipment]' so as to become an accession. See Tenn. Code Ann. Sec. 47-9-314 (emphasis added).
 
 
 39
 George Heywood testified that he made a personal inspection of all of the machinery and equipment in the Tennessee plant and specifically identified the separate machinery and equipment of Heywood-Wakefield, which was moved from Massachusetts to Tennessee. Jt. App. at 88-89; 292-93 (Exhibit 15). The appellant presented no evidence disputing the inspection and identification made by Mr. Heywood. Thus, it is reasonable to conclude that the appellant has failed to properly establish a security interest in the equipment and machinery moved from Massachusetts not only for the failure to describe the collateral in its lease/security agreement, but also because of the failure to describe the collateral in its U.C.C. financing statement. Without a valid financing statement filed with the Secretary of State, any interest the defendant may have in the machinery and equipment of Heywood-Wakefield would be unperfected and subordinate to the rights of other creditors. See Tenn. Code Ann. Secs. 47-9-301, 47-9-302.
 
 
 40
 With respect to Commerce Union's second argument, we also agree with the magistrate that BarclaysAmerican did have a perfected security interest in the disputed collateral. In conformity with the provisions of the Uniform Commercial Code, Heywood-Wakefield executed a security agreement in favor of BarclaysAmerican wherein Heywood-Wakefield 'unconditionally and irrevocably' granted a security interest in '[a]ll goods of the Debtor, including, without limitation, machinery [and] equipment . . . of every kind and description which the Debtor now owns or in which debtor may have or may hereafter acquire any interest. . . .' Jt. App. at 172 (Exhibit 1, Para. 2.1). Moreover, the plaintiff's security agreement specifically provides:
 
 
 41
 6.6 Total Agreement. This agreement, including the exhibits, schedules and other agreements referred to herein, is the entire agreement between the parties relating to the subject matter hereof, incorporates or rescinds all prior agreements and understandings between the parties hereto relating to the subject matter hereof, cannot be changed or terminated orally, and shall be deemed effective as of the date it is accepted by lender at its offices set forth above.
 
 
 42
 Jt. App. at 176 (Exhibit 1, para. 6.6).
 
 
 43
 The security agreement also specifically listed in paragraph 6.10 all agreements which were incorporated therein. It is to be noted that none of the preliminary documents relied upon and introduced by appellant (exhibits 11 through 14) to impeach plaintiff's security agreement are included as attachments to the security agreement. The trial court found that the plaintiff's security agreement was the 'final, integrated understanding and agreement between Heywood-Wakefield and the plaintiff' and that the description of collateral contained therein was specific enough to identify the disputed collateral. Memo. Op. at 28-29.
 
 
 44
 In addition to the plain, unambiguous language contained in plaintiff's security agreement, other facts in the case support the position that plaintiff intended to take a security interest in all of Heywood-Wakefield's personal property. The pre-loan statements of plaintiff regarding its security interst were explained by Mr. Spratlin, who conducted the preliminary investigation of Heywood-Wakefield's assets and who signed off on one or more of the pre-loan documents, as resulting from an absence of knowledge of the exact assets contained in the HeyWoodite building. Jt. App. at 58. The pre-loan documents were not signed by Heywood-Wakefield and do not establish a meeting of the minds or an agreement between Heywood-Wakefield and plaintiff to exclude any assets from their subsequently executed security agreement. Even the preloan documents indicate, however, that plaintiff intended to take a blanket security interest in all of Heywood-Wakefield's assets. See Jt. App. at 284 (exhibit 13).
 
 
 45
 Thus, the express language of the security agreement granting plaintiff a blanket security interest in all of the personal property of Heywood-Wakefield, especially when there is no evidence of over-reaching or wrongdoing on the part of plaintiff, 'is effective according to its terms between the parties . . . and against creditors' such as appellant and should control the court's conclusion on this subject. See Tenn Code Ann. Sec. 47-9-201; Memo. Op. at 21.
 
 
 46
 Accordingly, the judgment of the Honorable Robert P. Murrian is affirmed.